IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Sheila Rivers, | ) | |
| | ) | Civil Action No. 6:08-0016-GRA-WMC |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits (DIB) on September 24, 2002, alleging that she became unable to work on October 31, 2001.[2] The application was denied initially and on reconsideration by the Social Security Administration.

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2]The plaintiff subsequently filed an application for DIB on March 11, 2004, and an application for SSI on April 19, 2004. She filed applications for both DIB and SSI on March 16, 2005 (Tr. 293). These applications were consolidated with the plaintiff's original 2002 application for purposes of the ALJ's decision in this case (Tr. 293).

Following a hearing on September 24, 2003, the administrative law judge found on February 12, 2004, that the plaintiff was not under a disability as defined in the Social Security Act, as amended. This decision was subsequently vacated by the Appeals Council on April 21, 2004. A supplemental hearing was held on July 13, 2004, after which the ALJ issued a second unfavorable decision on February 24, 2005. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on May 9, 2005.

On July 11, 2005, the plaintiff filed an action for judicial review (C.A. 0:05-1961-TLW-BM). On October 17, 2006, United States Magistrate Judge Bristow Marchant recommended that the Commissioner's decision be reversed and the case be remanded for a proper evaluation and consideration of the relevant medical evidence, and for such further administrative action deemed necessary and appropriate. By order filed November 21, 2006, United States District Judge Terry L. Wooten adopted Judge Marchant's recommendation and the case was remanded to the Commissioner.

In the meantime, the plaintiff's March 2005 applications were granted in part and she was found to be disabled beginning February 1, 2006, her fiftieth birthday.

A supplemental hearing was held before a different ALJ on October 24, 2007, at which the plaintiff, her husband, her attorney, and a vocational expert appeared. On November 28, 2007, the ALJ issued a partially favorable decision, finding the plaintiff became disabled on February 1, 2006, but that she could perform a limited range of sedentary work before that date. The ALJ's decision became the final decision of the Commissioner when it was approved by the Appeals Council. The plaintiff then filed this action for judicial review on January 2, 2008.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

2

(1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

(2)     The claimant has not engaged in substantial gainful activity since October 31, 2001, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

(3)     The claimant has the following severe combination of impairments: osteoarthritis of the bilateral knees status-post surgery, obesity, and depression (20 CFR 404.1520(c) and 416.920(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: sit for 6 hours of an 8-hour day; stand/walk for 2 hours of an 8-hour day; frequently lift/carry light items; occasionally lift 10 pounds, never perform pushing/pulling, climb ladders, crawl, or be exposed to unprotected heights. She would also require a sit/stand option at will.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on February 1, 1056 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. On February 1, 2006, the claimant attained 50 years of age and her age category changed to an individual closely approaching advanced age (20 CFR 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Prior to February 1, 2006, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Beginning on February 1, 2006, the claimant has not been able to transfer any job skills to other

3

occupations (See SSR 82-41 and 20 CFR Part 404 Subpart P, Appendix 2).

(10)    Prior to February 1, 2006, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(11)    Beginning on February 1, 2006, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were not a significant nu7mber of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(12)    The claimant was not disabled prior to February 1, 2006, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

4

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the

5

Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 45 years old on October 31, 2001, when she alleges she became disabled, and 51 years old on November 28, 2007, when the ALJ issued his decision (Tr. 134). She has a high school education and has worked as a line inspector and customer service representative (Tr. 141, 146).

### Medical Evidence

The record reveals that the plaintiff is 5'3" tall and weighed between 205 and 230 pounds during examinations in the record. She has a history of successful arthroscopic right knee surgery in approximately 1998 (Tr. 231).

On September 5, 2001, the plaintiff complained to Dr. Bright McConnell, an orthopedist, of left knee pain. She denied any history of trauma. On examination, she ambulated without a limp and had painless range of motion in the hips, knees, and ankles.

6

Her left knee had a trace of effusion, but she had full knee extension and flexion greater than 130 degrees.  Her knees were stable, and she had moderate tenderness to palpation and mild crepitation.  X-rays showed no bony abnormality, although the plaintiff had lateral malalignment of both knees.  Her articular cartilage was fairly well preserved.  Dr. McConnell diagnosed a possible chronic medial meniscus pathology (Tr. 229-31).

At a follow-up visit on October 24, 2001, Dr. McConnell diagnosed a tear of the medial meniscus, as well as bursitis, in the left knee (Tr. 229).

The plaintiff underwent arthroscopic surgery on the left knee on November 1, 2001 (Tr. 229).  She underwent physical therapy between November 2001 and March 2002 (Tr. 189-210), reporting improvement on several occasions (Tr. 191, 194-98, 200-04, 207).

On January 23, 2002, Dr. McConnell noted that the plaintiff's symptoms were improving, although she still had a moderate amount of discomfort.  He concluded that she could return to light or sedentary duty, with no kneeling, squatting, or stooping (Tr. 227-28).

In March 2002, the plaintiff returned to Dr. McConnell and reported ongoing discomfort, although she said she did not use any anti-inflammatory medication.  Dr. McConnell prescribed Vioxx and a wedge heel for both shoes (Tr. 227).  A bone scan of the plaintiff's knees revealed osteoarthritis in the left knee and to a much lesser degree in the right knee, hyperemia, and no evidence of a stress fracture (Tr. 232).

On April 9, 2002, Dr. McConnell prescribed a knee brace.  The plaintiff said she was unable to perform her normal work activities due to knee pain.  Dr. McConnell indicated she was "available for light dut[y] activity only" (Tr. 226-27).

On May 9, 2002, the plaintiff told Dr. McConnell that her pain had markedly improved with the use of the brace.  She still had some effusion and persistent joint tenderness.  Dr. McConnell noted that she was limited to sedentary work for at least the next six weeks (Tr. 226).

On June 19, 2002, the plaintiff told Dr. McConnell that her symptoms were slowly improving, and expressed an interest in applying for disability benefits. Dr. McConnell found that her permanent restrictions would include "avoidance of any repetitious kneeling, squatting, prolonged standing or climbing unprotected heights" (Tr. 226).

On August 14, 2002, Dr. McConnell limited the plaintiff to "light duty status only," with no prolonged standing, squatting, stooping, or lifting over 15 pounds repetitiously (Tr. 225).

On September 11, 2002, the plaintiff reported having had eight days of relief with an intraarticular injection. Examination was unchanged. The plaintiff had decreased flexion in her knee (Tr. 224).

On October 4, 2002, the plaintiff presented to Dr. John J. McCrosson, an on referral from Dr. McConnell. Dr. McCrosson noted that the plaintiff was "mildly overweight" and walked with a "slight limp." He diagnosed left knee osteoarthritis and recommended unicompartmental arthroplasty (Tr. 221-22, 224).

On November 5, 2002, the plaintiff underwent a left knee unicompartmental arthroplasty (Tr. 240).

On December 12, 2002, State Agency physician Dr. J.D. Gonzalez reviewed the plaintiff's records and assessed her projected physical residual functional capacity as of October 2003. Dr. Gonzalez found that as of October 2003, the plaintiff would have the capacity to perform the exertional requirements of light work, with limited use of foot controls, no climbing ladders, ropes or scaffolds, and only occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. In an attached explanation, Dr. Gonzalez stated that the plaintiff would be considered disabled until October 2003, and that as of October 2003, she would be capable of doing light work as assessed (Tr. 242-51).

8

At a follow-up visit with Dr. McCrosson on December 20, 2002, the plaintiff walked with a cane and reported that the knee was "pretty good." Dr. McCrosson found no intra-articular fluid, no significant swelling, and no instability. X-rays showed good position and fixation of the components (Tr. 220).

On January 9, 2003, Dr. McCrosson found the plaintiff had mild to moderate swelling of the knee, with anatomic alignment and no instability. He indicated she should stay out of work until February 10, 2003 (Tr. 219).

On January 23, 2003, the plaintiff told Dr. McCrosson that her knee was still very painful. Examination revealed moderate effusion in the knee. Dr. McCrosson opined that she was "unable to perform work because of the knee pain and restricted range of motion[, but that] she could do some sedentary work if she were not on narcotic pain medication" (Tr. 217-19).

On February 26, 2003, Dr. McCrosson noted that the plaintiff walked with an antalgic gait and that her physical examination was "very inconsistent." He said that when the plaintiff was seated, her knee flexed to 90 degrees, but when he tried to examine it, she stopped it anywhere from 30 to 60 degrees, and sometimes let it slip to 90 degrees. Also, when talking while lying down, the plaintiff's knee came out to near full extension, but during examination, she stopped it approximately 20 degrees shy of full extension. Alignment was anatomic, and there was no instability or signs of infection or swelling. X-rays showed good position and fixation of the components without complicating features. Dr. McCrosson's impression was "left knee pain out of proportion with objective findings." He expressed concern that the plaintiff was exhibiting symptom magnification (Tr. 215-17).

On March 4, 2003, the plaintiff presented to Dr. James D. Spearman, an orthopedist, for an evaluation. Her right leg showed full range of motion without swelling, pain, or instability. Her left knee showed range of motion from 10 to 90 degrees, with pain on forced extension and flexion. X-rays showed either degenerative changes or a new

9

meniscal tear in the lateral compartment of the left knee. Dr. Spearman offered the options of continuing conservative treatment, repeat arthroscopic debridement, or total knee replacement. He noted that she was going to consider the options and follow-up with him. On a "Return to Work Recommendations" form, Dr. Spearman indicated that the plaintiff could not return to work until April 1, 2003 (Tr. 257-60).

The plaintiff failed to keep an appointment with Dr. Spearman on March 17, 2003, and there is no evidence that she returned to him after that date (Tr. 258).

On April 9, 2003, Dr. William H. Cain, a State agency physician, reviewed the plaintiff's records and assessed her physical residual functional capacity. Dr. Cain found the plaintiff could perform sedentary work that involved limited pushing and pulling with the lower extremities and no more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling (Tr. 261-68).

On May 21, 2003, the plaintiff told Dr. McCrosson that the stiffness in her knee had "all but gone away," and that she still had pain in the morning, which "[went] away" when she took Lortab. She stated that she did not have pain when she walked with a cane, and that her knee swelled when she did not use a cane. She said that she had been terminated from her job, was "out on disability," did no housework, and essentially sat on the couch all day. Dr. McCrosson's examination revealed no intraarticular fluid collection, "very mild swelling at most," normal alignment, no instability or crepitus, and flexion to 120 degrees. He described the plaintiff's work restrictions, as follows:

> She may return to sedentary work 20 hours per week increasing five hours per week until she reaches 40 hours per week. Some type of job retraining may be necessary. I would expect her to be able to return to light duty at work on a permanent basis in three months. At that time, she will have the limit of no lifting greater than 50 lbs. and avoidance of squatting and stooping and climbing. Also avoidance of excessive standing or walking

(Tr. 800-01).

10

On July 9, 2003, the plaintiff reported a flare-up in left knee pain. On examination, the knee had zero to 120 degrees of flexion, anatomic alignment, no instability, and no detectable effusion or swelling. She ambulated well without an assistive device. Dr. McCrosson told the plaintiff that she could either live with the pain and take over-the-counter analgesics as long as she could stand it, or have total knee arthroplasty. He indicated that he believed she was "too young to try to go out on disability on this," and discouraged her from that option. He encouraged the plaintiff to start looking for a job and to take Tylenol for pain, rather than narcotic analgesics (Tr. 212).

On March 12, 2004, Dr. Gregory W. Niemer, a rheumatologist, wrote a letter in which he indicated that he had been treating the plaintiff for six months,[3] and that she continued to have marked knee pain and stiffness that increased during activity. He diagnosed significant degenerative joint disease in the knees bilaterally, and indicated that she was unable to walk more than 10 minutes at a time, stand more than 10 minutes at a time, sit more than 20 minutes at a time, and unable to bend, stoop, or crawl. He also wrote that the plaintiff was unable to lift more than 10 pounds and that her condition was unlikely to change (Tr. 284).

On June 18, 2004, the plaintiff presented to consultative psychiatrist Dr. Ray Hodges for evaluation in connection with her application for disability benefits. The plaintiff stated that her primary reason for applying for disability was her knee pain, and said she could no longer stand or sit. She denied having any upper body pain. The plaintiff complained of feeling depressed and crying frequently, with varying levels of energy and poor sleep. She indicated she took narcotic pain medications, which were prescribed by Dr. Niemer. On examination, Dr. Hodges noted that the plaintiff used a cane to ambulate

---

[3]The records of Low Country Rheumatology reflect that Dr. Niemer treated the plaintiff with medication for osteoarthritis of the knees from November 6, 2003, to March 28, 2005 (Tr. 708-29). Dr. Niemer's progress notes are largely illegible (Tr. 708-29).

and needed to alternate between sitting and standing. She was frequently tearful, but denied suicidal or psychotic thoughts. She needed a slight prompt on object recall testing, but her immediate and long-term memory were otherwise fully intact, as was her concentration. Her insight was very good, her judgment was unimpaired, and her intellect appeared to be average. Dr. Hodges noted that the plaintiff's depression was severe enough to warrant antidepressant medication, but "did not seem disabling in it's own right, however, as a comorbid condition with her chronic pain and severe arthritis in both of her knees, it does seem disabling" (Tr. 285-87).

Dr. Kwame N. Iwegbue examined the plaintiff at the Commissioner's request on July 18, 2005. Dr. Iwegbue found the plaintiff moved slowly with a quad-cane and had depressed affect, normal blood pressure, normal sensory and motor function, and decreased active and passive range of motion of the knees, lumbar spine, and neck. He reported an impression of osteoarthritis and hypertension (very well controlled with medication). Dr. Iwegbue concluded that the plaintiff's degenerative joint disease "could be serious enough to limit her ability to function or carry out her usual activities of daily living," and recommended evaluation by an orthopedist (Tr. 699-701).

Dr. George T. Keller III, a State Agency physician, reviewed the plaintiff's records and assessed her physical residual functional capacity on August 3, 2005. Dr. Keller found the plaintiff could perform sedentary work that required no more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling (Tr. 752-59).

Dr. Peter Naylor, a psychiatrist, evaluated the plaintiff at the Commissioner's request on September 12, 2005. The plaintiff related that she had never seen a psychiatrist for treatment before and that she was taking Effexor and Diazepam, prescribed by her family physician. She complained of sadness, tearfulness, decreased motivation and energy, poor concentration, and social withdrawal. She stated that she was unable to work

because she could not sit or stand for very long.  Dr. Naylor concluded she had poor concentration, was unable to pay attention because of sedation (possibly related to pain medication), and could not "endure to task completion or make the personal and social adjustments required for the workplace." He diagnosed her with major depressive disorder and a GAF code of 50,[4] and recommended psychiatric treatment for depression (Tr. 660-62).

Samuel W. Goots, Ph.D., a State agency psychological consultant, completed a Psychiatric Review Technique form concerning Plaintiff on September 30, 2005.  Dr. Goots concluded that the plaintiff had an affective disorder that did not meet or equal the criteria of a listed impairment and caused mild limitations in daily activities and social functioning, moderate limitations in concentration/persistence/pace, and no extended episodes of decompensation.  In a Mental Residual Functional Capacity Assessment, Dr. Goots reported that the plaintiff had no significant limitations in most areas of work-related mental functioning, and moderate limitations in the following areas:  carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision, and interacting appropriately with the general public.  Dr. Goots added that the plaintiff had adequate concentration to complete routine tasks and would require initial supportive supervision in a low-stress setting with limited contact with the general public (Tr. 738-51).

The plaintiff was seen at OASIS Christian Counseling on three occasions between October 24, 2005, and February 20, 2006.  She complained of "feeling down" for the past two years, crying spells, decreased appetite and concentration, and anxiety

---

[4]A Global Assessment of Functioning (GAF) code between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV*), 32 (4th ed. 1994).

attacks.  Her records reflect diagnoses of major depressive disorder (moderate) and dysthymia, a GAF code of 60,[5] and prescriptions for Diazepam, Seroquel (in place of Diazepam), and Effexor (Tr. 695-98).

Dr. Carl E. Anderson, a State agency physician, assessed the plaintiff's physical residual functional capacity on February 21, 2006.  Dr. Anderson concluded that the plaintiff could perform sedentary work that required no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling (Tr. 668-75).

James K. Phillips, Ph.D., a State agency psychological consultant, completed a Psychiatric Review Technique form concerning the plaintiff on March 3, 2006.  Dr. Phillips concluded that the plaintiff had an affective disorder that did not meet or equal the criteria of a listed impairment, but caused mild limitations in daily activities, moderate limitations in social functioning and concentration/persistence/pace, and no extended episodes of decompensation.  In a Mental Residual Functional Capacity Assessment, Dr. Phillips reported that the plaintiff had no significant limitations in most areas of work-related mental functioning, and moderate limitations in the following areas:  understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; and interacting appropriately with the general public.  He explained that although the plaintiff was limited in her capacity to handle complex information, deal with numbers of people, and maintain concentration on tasks, she could do unskilled work, handle simple procedures, and manage relations with a small number of co-workers and supervisors.  He also stated that the plaintiff would not do well in situations requiring "intense sustained concentration" or relations with large numbers of people or the public (Tr. 680-93).

---

[5]A GAF code between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 32.

*Hearing Testimony*

At the July 13, 2004 hearing, the plaintiff testified that she weighed 235 pounds, had sharp pain in both knees, and could not sit or stand for very long (Tr. 71). She said she used a morphine patch every three days, which made her sleepy but did not eliminate the pain (Tr. 72). She said her primary care physician had prescribed an antidepressant medication (Tr. 73). She said she used a cane to walk, and that she could not concentrate (Tr. 75). She said Dr. Niemer had recommended bilateral knee replacements (Tr. 78). She also said she had not driven a car since 2001 (Tr. 79). With regard to her daily activities, the plaintiff said she alternated between lying in bed and sitting in a chair (Tr. 82-83).

At the October 24, 2007 hearing, the plaintiff testified that she was unable to work after October 2001, because light-duty work was unavailable (Tr. 312-15). She testified that since October 2001, she had had three knee surgeries and surgery to remove a tumor in her back (Tr. 312-13). She testified that she had arthritis in her left foot that required her to wear a brace, and that she suffered from depression (Tr. 313-14). She stated that she had to get up and walk around after sitting for 15 minutes because her knee became stiff (Tr. 315).

Bernard Rivers, the plaintiff's husband, testified that after October 2001, the plaintiff was unable to do things like household chores and grocery shopping because of knee pain, and that she just lay around because of depression (Tr. 318-19).

The ALJ asked Arthur Schmitt, Ph.D., a vocational expert, to consider a person of the plaintiff's age, education, and work experience who was limited to sedentary work that allowed for an at-will sit/stand option, required no pushing or pulling with the lower extremities, no climbing of ladders, scaffolds, or ropes, no crawling, and no exposure to

15

hazardous environments such as unprotected heights (Tr. 321). Dr. Schmitt testified that such a person could perform the unskilled, sedentary job of redemption clerk (Tr. 321).[6]

## ANALYSIS

The plaintiff has a high school education and past relevant work experience as a line inspector and customer service representative. She alleges that she became disabled on October 31, 2001, due to arthritis in both knees. The plaintiff was 45 years old on the date she claims she became disabled and 51 years old on the date the ALJ issued his decision. The period at issue before the ALJ was from October 31, 2001, to February 1, 2006. The ALJ issued a partially favorable decision, finding the plaintiff became disabled on February 1, 2006, but that she had the residual functional capacity ("RFC") to perform a limited range of sedentary work before that date. The plaintiff argues that the ALJ erred by (1) failing to conduct a proper listing analysis; (2) failing to properly consider the impact of her obesity; (3) failing to consider the combined effect of her multiple impairments; and (4) improperly finding that she retained the RFC to perform sedentary work.

The plaintiff first argues that the ALJ failed to properly consider whether her impairments met or equaled Listings 1.02 or 1.03. The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). Social Security Ruling ("SSR") 86-8 states:

> [W]hen . . . an individual's impairment or combination of
> impairments meets or equals the level of severity described in

---

[6]Part of the ALJ's hypothetical question to Dr. Schmitt and part of Dr. Schmitt's response were not recorded (Tr. 304, 321). According to the ALJ's decision, however, Dr. Schmitt testified that the plaintiff could perform the jobs of surveillance system monitor, telephone clerk, and coupon redemption clerk, given her residual functional capacity (Tr. 304). The plaintiff states that Dr. Schmitt identified the job of redemption clerk and "one other position" (*see* pl. brief at 3).

> the Listing, and also meets the duration requirement, disability will be found on the basis of the medical facts alone in the absence of evidence to the contrary (e.g., the actual performance of SGA, or failure to follow prescribed treatment without a justifiable reason).

SSR 86-8, 1986 WL 68636, at *3.  The Fourth Circuit Court of Appeals held that in reaching a listing determination an ALJ must first identify the applicable or relevant listed impairments and then compare these criteria with the evidence of the claimant's symptoms. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).The court in *Cook* concluded that it is impossible to ascertain whether there is substantial evidence to support an ALJ's listing decision without this type of analysis. *Id.*  Relying on *Cook*, the court in *Beckman v. Apfel*, C.A. No. WMN-99-3696,  2000 WL 1916316, at *9 (D. Md. 2000) clarified that this basic rule is applicable to cases in which there is "ample factual support in the record" for a particular listing.

The plaintiff first argues that she meets Listing 1.03, reconstructive surgery of a major weight-bearing joint.  Listing 1.03 is met where the claimant does not return to effective ambulation (as defined by 1.00B(2)(b)) within 12 months status post surgical reconstruction. To ambulate effectively, the claimant must be able to sustain a reasonable walking pace over a sufficient distance to be able to carry out the activities of daily living, travel without companion assistance, and from a place of employment or school. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B(2)(b)(1) and (2).

The plaintiff further argues that her osteoarthritis meets Listing 1.02, major dysfunction of a joint.  To meet the requirements of Listing 1.02, the claimant's impairment must be:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space

17

> narrowing, bony destruction, or ankylosis of the affected
> joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint
> (i.e., hip, knee, or ankle), resulting in inability to ambulate
> effectively, as defined in 1.00B2b.
> ***

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A.

The ALJ found as follows: "In regard to Listing 1.02, I note that the claimant's osteoarthritis of the knees does not result in an inability to ambulate effectively, therefore the claimant does not meet this listing " (Tr. 297). The ALJ did not consider Listing 1.03. The defendant argues that because the ALJ was required to give controlling weight to Dr. McCrosson's opinion[7], the finding that the plaintiff's impairments did not meet a listing is based upon substantial evidence. The defendant, however, cites no authority for the proposition that a listing analysis is not needed when a treating physician opines that a claimant can return to work.

This court agrees with the plaintiff that the ALJ failed to conduct a proper listing analysis of Listings 1.02 and 1.03. Further, as argued by the plaintiff, the evidence shows that the plaintiff's impairments meet every requirement of Listing 1.02:

> • April 30, 2001 - Physical exam revealed crepitation on range of motion of bilateral knees as well as decreased range of motion to the right knee (Tr. 282).
>
> • July 10, 2001 - On exam, she could only flex to 20 degrees secondary to pain. There was 4+ crepitation on range of motion and tenderness to the medial joint line. Diagnosis: significant degenerative disease to her left knee (Tr. 279).
>
> • October 24, 2001 - MRI of left knee revealed a horizontal cleavage tear of the posterior third of her medial meniscus as well as some underlying pes anserine bursitis and lateral patellofemoral malalignment (Tr. 229).

---

[7]In May 2003, six months after the plaintiff's knee replacement surgery, Dr. McCrosson stated that the plaintiff could return to sedentary work for 20 hours per week increasing five hours per week until she reached 40 hours. He further stated that he expected the plaintiff to be able to return to light duty on a permanent basis in three months (Tr. 800-01).

18

• November 7, 2001 - Status post arthroscopy to her left knee with fluid buildup and bruising (Tr. 228).   Five days later, which was six weeks status post surgery 1-2+ effusion with continued discomfort at the lateral release site. Dr. McConnell recommended that the plaintiff continue with compression and wanted her fitted for a knee sleeve.

• December 18, 2001 – Therapist noted the plaintiff's gait was slow with a slight limp and that there was still some increased fluid around the patella (Tr. 198).

• January 23, 2002 - 2 ½ months status post left knee surgery, exam showed continued medial joint line discomfort (Tr. 227).

• February 8, 2002 – The plaintiff had experienced increased pain and swelling to her knee. On exam, the therapist noted swelling to the medial and upper patella portion of her left knee (Tr. 192).

• April 9, 2002- Bone scan revealed the need for an unloader knee brace and significantly increased uptake in the medial compartment of her left knee. The plaintiff was unable to perform her normal work activities secondary to pain. Dr. McConnell instructed her to return in four to six weeks after she obtained the brace (Tr. 226).

• April 19, 2002 - Exam revealed decreased range of motion to left knee (Tr. 276).

• May 8, 2002 - Exam revealed 1+ effusion and persistent medial joint line tenderness (Tr. 226).

• June 19, 2002 – Exam revealed full thickness articular cartilage loss of the medial compartment of the left knee and that permanently restricted the plaintiff from repetitive kneeling, squatting, prolonged standing or climbing as well as unprotected heights (Tr. 226).

• August 6, 2002 - Exam revealed continued pain to left knee and fatigue (Tr. 275).

• August 14, 2002 – Exam revealed significant discomfort to left knee with 1+ effusion and diffuse tenderness, as well as a very focal full thickness defect of her medial femoral condyle and significant lateral patellofemoral arthrosis. Dr. McConnell aspirated her knee on this day and instructed the plaintiff that further intervention may be required if her knee didn't significantly improve with this (Tr. 225).

• September 11, 2002 - X-rays taken on this day revealed a definite diminution of the medial compartment of the left knee (Tr. 224).

• October 4, 2002 – Exam revealed that the pain originated from the medial joint line of the left knee. Dr. McCrosson reviewed the x-rays which revealed bone on bone medial compartment osteoarthritis with varus deformity as well as some lateral patella subluxation on the merchant view. His impression was of left knee osteoarthritis and recommended a unicompartmental arthroplasty. He noted that a total knee replacement in the future was likely (Tr. 220).

• November 11, 2002 - Dr. McCrosson admitted the plaintiff to Roper Hospital for a left knee medial compartmental arthroplasty (Tr. 240).

• December 12, 2002 - a medical consultant from the Social Security Administration performed a Residual Functional Capacity Assessment of the plaintiff. The consultant opined that the plaintiff would be disabled until October of 2003, which was 12 months after the last treatment visit indicated in the consultant's record (Tr. 250).

• December 20, 2002, - Exam revealed that the plaintiff walked with a cane and looked quite debilitated. She was limping and kept the knee bent (Tr. 220).

• January 9, 2003 - Exam revealed mild to moderate swelling of the knee with a trace flexion contracture and that the plaintiff walked with an antalgic gait and needed the cane. Dr. McCrosson told the plaintiff to stay out of work until February 10, 2003 and that he would see her at the end of the month. The plaintiff was to continue on her Lortab and Vioxx for pain relief (Tr. 219).

• January 23, 2003 – Exam revealed that the plaintiff seemed quite debilitated with a flat affect during most of the examination and moderate effusion with soft tissue tenderness to the left knee. X-rays revealed moderate effusion. Dr. McCrosson noted that it was fair to say that the plaintiff was unable to perform work because of the knee pain and restricted range of motion (Tr. 217).

• February 26, 2003 – Exam revealed that the plaintiff walked with an antalgic gait and the left knee revealed fluid within the prepatellar bursa and a small effusion (Tr. 217).

• March 3, 2003 – The plaintiff obtained a second opinion from Dr. Spearman, another orthopedic specialist. On exam, Dr. Spearman noted that the plaintiff had significant pain along the lateral joint line. He reviewed her x-rays as well as Dr. McCrosson's notes. His impression was that the plaintiff's exam was consistent with a torn lateral meniscus or degenerative changes to the lateral compartment of her left knee. Dr. Spearman filled out a Return to Work Recommendations form restricting the plaintiff from work and noting that she would require further surgery for compartmental debridment or a total knee replacement (Tr. 260, 860).

• March 12, 2004 - Dr. Niemer from Low Country Rheumatology noted that the plaintiff continued to have marked knee pain and stiffness with increased pain upon activity. Dr. Niemer referenced the significant degenerative joint disease as seen on x-rays of the knees bilaterally. He noted her multiple treatment modalities including medication and surgical intervention. Dr. Niemer opined that the plaintiff's pain greatly limited her daily activities and that she was unable to walk and/or stand for greater than ten minutes at a time, or sit for greater than 20 minutes at a time. She was unable to lift more than ten pounds and could not bend/stoop/crawl at all. Dr. Niemer opined that he did not think the plaintiff's condition would change much in the future because her disease was chronic (Tr. 284).

• June 18, 2004 - Dr. Hodges noted that the plaintiff had to stand up twice during the interview secondary to stiffening pain to her knees. His impression was that "as a comorbid condition with her chronic and severe arthritis to both of her knees, her condition seemed disabling" (Tr. 287).

• July 18, 2005 – Exam revealed that the plaintiff ambulated with a quad cane, moved slowly, and that she had decreased active and passive range of motion to her bilateral knees (Tr. 700). X-ray of bilateral knees revealed osteophytes and signs of degenerative joint disease (Tr. 700, 701).

• In August of 2005, a disability examiner noted that the plaintiff was chronically ill appearing and ambulated slowly with a quad cane (Tr. 753). The disability examiner also opined that the plaintiff's complaints were credible (Tr. 757).

•• At the hearing in 2007, the plaintiff testified that she used a walker and a cane and had to install a railing at her home to keep from falling down when her knees would "give out" (Tr. 314). The plaintiff's husband testified that she was unable to perform household chores or shop because of the pain in her knees and that she spent most of her days lying down (Tr. 319).

Furthermore, the ALJ failed to consider the impact of the plaintiff's obesity at step three of the sequential evaluation process. SSR 02-1p recognizes that obesity may be a factor in both "meets" and "equals" determinations at step three of the sequential evaluation. SSR 02-1p, 2000 WL 628049, at *5. The ruling states:

> Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the

> extent that the combination of impairments meets the
> requirements of a listing. This is especially true of
> musculoskeletal, respiratory, and cardiovascular impairments.
> . . .

*Id.*  In this case, the ALJ found that the plaintiff's obesity was a major impairment, along with osteoarthritis of both knees and depression; however, the ALJ did not consider the impact of the plaintiff's "extreme obesity" at step three of the sequential evaluation process (Tr. 296).  The plaintiff testified that her medication caused her to gain weight (Tr. 38) and her weight gain exacerbated the pain in her knees (Tr. 74).

Substantial evidence does not support the ALJ's finding that the plaintiff's impairments did not meet or were not medically equal to Listing 1.02.  As this court finds that the plaintiff should have been found disabled at step three of the sequential evaluation process, the remainder of the plaintiff's allegations of error will not be discussed.

## CONCLUSION AND RECOMMENDATION

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits.  The plaintiff has had three disability hearings heard by two different ALJs over the six years since she filed for disability, and this case has already been remanded once.  Reopening the record for more evidence would serve no purpose.  *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974) (finding that where case had been pending in the agency and courts for five years and had been remanded once before for additional evidence, reversal without remand was warranted).  Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the plaintiff be awarded benefits.

February 9, 2009
Greenville, South Carolina

WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE